UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                      Case No.: 22-20370

v.                                  Honorable Gershwin A. Drain

NICHOLAS D. WOODS-GIBBY,

      Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [#70]

### I.    INTRODUCTION

On July 19, 2022, Defendant Nicholas Woods-Gibby was charged by way of Indictment with one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). On November 23, 2022, Defendant filed a Motion to Suppress Evidence. The Government filed a Response in opposition on December 14, 2022.

An evidentiary hearing on this matter was held on February 6, 2023. At the hearing, Defendant and Michigan State Police (MSP) officers Benjamin Sonstrom, Chadwick Bloom and Matthew Kiser testified. The parties further stipulated to the admission of video footage from the Greyhound bus terminal, as well as a sketch

of the bus boarding area, which was prepared by Officer Kiser.  For the reasons that follow, the Court grants Defendant's Motion to Suppress Evidence.

## II.    FACTUAL BACKGROUND

The events giving rise to this action occurred at the Greyhound Bus Station in Detroit, Michigan.  According to Trooper Bloom, an officer for eight years, Detroit is a narcotics supply city for several areas including West Virginia, Ohio, Kentucky, and South Carolina.  He testified that drug traffickers prefer to use interstate bus travel because Greyhound does not require passengers to show identification and does not subject bags to inspections.  As such, FBI and Michigan State Police officers have been assigned to the County of Macomb Enforcement Team (COMET) unit to conduct regular operations at the Greyhound bus station in Detroit to find and stop passengers from transporting drugs.  Both Bloom and Sonstrom have received extensive training on narcotics trafficking and interpreting body language.  They have both been assigned to COMET for approximately three years and both have participated in hundreds of bus interdiction investigations.

On February 28, 2022, just prior to the 12:50 p.m. bus's departure, Trooper Sonstrom noticed Defendant, a thirty-year old African American male, standing inside of the bus terminal.  Trooper Sonstrom, who was outside near the buses, claims he could see Defendant through the glass windows of the lobby area. Trooper Sonstrom did not recognize Defendant.  He testified that Defendant

appeared nervous and when their eyes met, Defendant's jaw began to move, which, according to Trooper Sonstrom, can be indicative that the person is under stress or nervous.  He further noted that Defendant took a big gulp of the iced tea he had in his right hand.  He found this behavior also suggestive of nervousness.  He explained that nervousness can cause the mucus membranes to become dry resulting in dehydration and a need to drink.[1]

Defendant testified that just prior to boarding the bus, he was on a video call with his girlfriend via FaceTime.  As Defendant exited the lobby of the bus terminal, he proceeded toward the boarding line before stopping to throw away his iced tea.  Trooper Sonstrom and Trooper Bloom, both Caucasian males, along with at least two other officers approached Defendant and told him "not to run."  The officers were armed and wearing MSP uniforms.   Trooper Sonstrom, a six-foot male with a military style haircut, positioned himself in front of Defendant so that Defendant was prevented from accessing the bus.  Trooper Sonstrom asked Defendant where he was traveling and if he possessed any identification.

---

[1] The Court notes the discrepancy between the Government's response brief and the officers' testimony.  In the Government's brief, the Government argued Defendant caught Trooper Sonstrom's attention because he arrived late to the bus terminal, was fidgeting, and continually placing his hands in his pockets. *See* ECF No. 26, PageID.84–85. However, during the February 6, 2023 evidentiary hearing in this matter, none of the officers provided testimony to support the Government's argument that Defendant arrived late, was fidgeting and continuously placing his hands in his pockets.  The video likewise fails to support the Government's contention that Defendant was fidgeting or placing his hands in his pocket.

Defendant informed the officers that he was traveling to Charleston, West Virginia, but did not have any identification with him. Trooper Sonstrom asked Defendant for his name and said "give me your ticket." Defendant paused and looked at his ticket before providing the name, "Raheem Davis." Trooper Sonstrom claims Defendant's voice appeared shaky. Trooper Sonstrom took Defendant's ticket and gave it to Trooper Bloom. Trooper Sonstrom testified that even though Defendant had not committed any crime, at this point Defendant was not free to leave because he had not returned Defendant's bus ticket.

The video footage reveals that Trooper Sonstrom took Defendant's bus ticket roughly twenty seconds after Defendant exited the bus station. Defendant testified that Trooper Sonstrom snatched Defendant's cell phone from his left hand almost immediately after Trooper Sonstrom gave Trooper Bloom Defendant's bus ticket. Neither Trooper Sonstrom nor Trooper Bloom could recall whether Trooper Sonstrom took Defendant's cell phone. However, Trooper Bloom also testified that Defendant's cell phone had been taken from his person. Moreover, a review of the video from the bus terminal corroborates Defendant's testimony that Trooper Sonstrom snatched his cell phone from his hands within five seconds of handing the ticket to Trooper Bloom.

Trooper Sonstrom and Trooper Bloom describe the encounter up to this point as polite and maintain that Defendant was cooperative. However, Defendant

testified that the troopers were using loud voices from the inception of the encounter.  Defendant was never given his bus ticket or cell phone back, and he was never told he could have his property back and board the bus. Defendant testified that he did not believe he could leave and get on the bus.  Trooper Sonstrom counters that Defendant never told him he did not want to talk to him, but concedes he never informed Defendant he was free to decline consent or otherwise go about his business and board the bus.

The officers then asked Defendant for his date of birth and residence, and Defendant gave his address and birthdate of 12/9/1990.  At this point, Trooper Sonstrom asked if Defendant would consent to a pat down search.  Trooper Sonstrom testified that Defendant consented to the pat down search.  However, Defendant disputes that he consented to a pat down search.  He testified that he asked that Sonstrom get a warrant, and Sonstrom responded that he needed to search Defendant for his protection.  While Sonstrom informed Defendant that he needed to pat him down for his protection, he also admitted during cross examination that Defendant had not been aggressive or threatening with the troopers, and Sonstrom had no reason to believe Defendant possessed any weapons.

During the pat down, Sonstrom went into Defendant's pocket and retrieved his wallet.  Inside of Defendant's wallet, Trooper Sonstrom discovered Defendant

did, in fact, have identification with him.  Defendant testified that he did not

consent to Trooper Sonstrom going into his pockets and perusing the contents of

his wallet.  Trooper Sonstrom testified that he does not ask permission for

everything.

A review of Defendant's identification revealed that he had not given the

troopers truthful answers about his name, residence, and date of birth.  Trooper

Bloom asked Defendant why he had provided false answers and Defendant told

him it was because he believed he had outstanding warrants.  Trooper Sonstrom

gave Defendant's identification to Trooper Bloom, who ran a LIEN check and

learned that Defendant had outstanding warrants and the officers placed Defendant

in handcuffs.

 Trooper Sonstrom then asked Defendant for consent to search his backpack

and Defendant refused consent.  Trooper Sonstrom testified that Defendant did

give consent for an open-air dog sniff of Defendant's bag.  The MSP-certified

canine positively alerted to the backpack for the presence of narcotics.  The

officers then conducted a physical search of Defendant's backpack and recovered

approximately 2.2 kilograms of methamphetamine.

## III.   LAW & ANALYSIS

The Fourth Amendment provides that "the right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated . . . ." *United States v. Mendenhall*, 446 U.S. 544, 550 (1980). "[A] person is seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 555.

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200–201 (2002); *see also Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage – so long as the officers do not convey a message that compliance with their requests is required."). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage — provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 202 (citing *Bostick*, 501 U.S. at 434-35).

However, officers may not detain an individual "even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491, 498 (1983) ("[R]easonable suspicion of criminal activity warrants a temporary seizure

for the purpose of questioning limited to the purpose of the stop."). *Id*. "[O]nce a consensual encounter escalates to the point where the individual is seized, the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. Jan. 26, 2021) (internal quotation marks and citation omitted).

Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may the Court conclude that a seizure has occurred. *Mendenhall,* 446 U.S. at 552 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The standard is an objective one. *Drayton*, 536 U.S. at 202. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 555; *see also United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009). Indeed, "words alone may be enough to make a reasonable person feel that he would not be free to leave." *United States v. Richardson*, 385 F.3ed 625, 629 (6th Cir. 2004).

Of course, a search authorized by consent is wholly valid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "The test applied to determine if consent

is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005) (citing *Bustamonte*, 412 U.S. at 227). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Royer*, 460 U.S. at 501–02.  The Government's burden to show consent is "by a preponderance of the evidence . . . [and] through clear and positive testimony." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996); *see also United States v. Chambers*, 646 F. App'x 445, 448 (2016) (noting that it is the government's burden to show that "consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.").  A defendant's Fourth Amendment rights are violated when law enforcement officers act with "such a show of authority that [the] [d]efendant reasonably believed he had no choice but to comply." *United States v. Saari*, 272 F.3d 804, 808 (6th Cir. 2001).

Defendant argues he was unlawfully seized when the four officers approached him, told him not to run and immediately took his bus ticket and cell phone.  Defendant asserts no reasonable person in his position would have felt at liberty to ignore the police presence and go about his business.  Because the

officers did not possess reasonable suspicion or probable cause that Defendant was engaged in criminal activity, their seizure of Defendant was unlawful.  He further argues that he did not give valid consent for the pat down search because it was tainted by the officers' illegal seizure.  As such, any evidence seized and any subsequent statements are fruits of an illegal seizure in violation of the Fourth Amendment.

The Government counters that during the officers' interactions with Defendant, their actions lawfully progressed from consensual encounter to reasonable suspicion and then to probable cause to arrest.  The Government maintains that when the officers approached Defendant at the boarding line, they did so with lawful authority because this was a consensual encounter.  They asked Defendant routine questions, such as his travel destination, his name, and date of birth.  The Government insists that a reasonable person would have felt free to disregard the police and go about his business, therefore, Defendant's consent to the pat down search was voluntary.

In light of the totality of the circumstances, Defendant was seized when the officers told him not to run, took his bus ticket and cell phone, and failed to inform him that he was free to decline consent.  At this point, the troopers had no reason to believe Defendant was engaged in criminal activity.  The Court is skeptical of Trooper Sonstrom's testimony that he believed Defendant was nervous based on

his jaw movements and dry mucus membranes.  In any event, these factors, even if true, do not create reasonable suspicion to detain Defendant under *Terry v. Ohio*, 392 U.S. 1 (1968) or probable cause to seize Defendant under the Fourth Amendment.  *See United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) ("Ambiguous behavior does not give rise to reasonable suspicion because reasonable suspicion looks for the exact opposite of ambiguity."); *see also United States v. Cottrell*, No. 21-20676, 2022 U.S. Dist. LEXIS 192641, *9 (E.D. Mich. Oct. 21, 2022).  Additionally, that drug dealers prefer to use bus travel and Detroit is a purported drug source for other localities such as Charleston are both contextual factors, which the Sixth Circuit has held "should not be given too much weight because they raise concerns of racial, ethic, and socioeconomic profiling." *Young*, 707 F.3d at 603.  Trooper Sonstrom admitted that at the point he took Defendant's bus ticket, Defendant had not committed any crime, had not been aggressive or threatening with the troopers, and gave the troopers no reason to believe he possessed any weapons.  As such, absent voluntary consent, there was no reasonable suspicion to detain and search the Defendant.

In *Mendenhall*, the defendant was approached by two DEA agents at the airport.  *Mendenhall*, 446 U.S. at 548.  The agents requested the defendant's airline ticket and identification and when the names did not match, they informed her that they were narcotics officers.  *Id*.  After returning the ticket and identification, one

of the officers asked the defendant if she would accompany him to the DEA airport office for further questioning. *Id*. Once in the office, the agents asked to search the defendant and her handbag; and advised of her right to decline. *Id*. at 549. In concluding the defendant was not seized and her consent was voluntary, the *Mendenhall* court relied on the fact the defendant's ticket and identification had been returned to her, and that she "was twice expressly told that she was free to decline to consent to a search, and only thereafter explicitly consented to it." *Id*. at 558.

Unlike the defendant in *Mendenhall*, Defendant was told "not to run," and his bus ticket and cell phone were never returned. Defendant was also never advised that he could decline consent to the search. When he objected to the search and asked for a warrant, Sonstrom did not tell him he was free to decline. Instead, Sonstrom told him the exact opposite. He told Defendant he had to search him for his own protection. No reasonable person in Defendant's position would believe he was free to decline the request and terminate the encounter and go about his business. The Government has not shown Defendant's consent was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Chambers*, 646 F. App'x at 448.

In *Royer,* two plainclothes detectives observed the defendant at the airport. *Royer*, 460 U.S. at 493. Believing he fit the so-called "drug courier profile," the

two detectives approached him, identified themselves as police officers and asked the defendant if he had a moment to speak with them. *Id.* at 494. The officers asked for the defendant's plane ticket and identification, which he provided. *Id*. When the officers noticed a discrepancy between the name on the ticket and the name on the identification, they informed the defendant they were investigating narcotics trafficking and suspected him of transporting narcotics. *Id*. Without returning his airline ticket or identification, the officers asked the defendant if he would accompany them to a room adjacent to the concourse. *Id*. The detectives had also retrieved the defendant's luggage from the baggage claim without his consent. *Id*. Once inside the room, the detectives asked the defendant if he would consent to a search of his luggage, and without responding to the request, the defendant produced a key and unlocked the suitcase where marijuana was discovered. *Id*. at 494–95.

In concluding the defendant was illegally detained at the time he provided consent for the search, the *Royer* Court rejected the government's suggestion that the encounter had been consensual. *Id.* at 501. The *Royer* Court noted that "asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves[,]" but the encounter became an unlawful seizure once "the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the

police room, while retaining his ticket and driver's license and without indicating that he was free to depart[.]" *Id.* at 501–02.  As such, the defendant "was effectively seized for the purposes of the Fourth Amendment." *Id*. The *Royer* Court concluded that [t]hese circumstances surely amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave." *Id*.

The Government has failed to demonstrate Defendant's consent was freely and voluntarily given.  The circumstances here are akin to those present in *Royer*. The Government's claim that the encounter was consensual is belied by the record. No consensual encounter begins with the words "do not run."  Moreover, Trooper Sonstrom admits that Defendant was not free to leave once he took his ticket and handed it to Trooper Bloom.  The video footage from the bus terminal provides further support that the MSP officers acted with "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." *Saari*, 272 F.3d at 808.  Four armed officers approached Defendant as he attempted to get on the bus and told him not to run.  Trooper Sonstrom then took his bus ticket and his cell phone in a matter of seconds.  No reasonable person would believe he had the right to get on the bus under these circumstances.  Indeed, Sonstrom admitted that Defendant was not free to leave the encounter and get on the bus.

Even if the Court were to conclude that Defendant was not illegally seized at the time he gave consent for the pat down search, his Fourth Amendment rights were still violated because Trooper Sonstrom's pat down search exceeded the scope of Defendant's consent. *See Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991) (holding that when law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search). The standard for measuring the scope of consent given is objective reasonableness — "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id*. at 251. In this case, Trooper Sonstrom asked if Defendant would consent to a pat down search. He informed the Defendant he needed to search him for officer protection. A reasonable person would understand that Trooper Sonstrom's request was for a pat down of Defendant's outer clothing to feel for weapons, and not consent to go through his pockets and peruse his wallet, which could not possibly contain a weapon. Thus, even if Defendant was not seized when Trooper Sonstrom took his bus ticket and cell phone and he voluntarily consented to the pat down search for weapons, Trooper Sonstrom was not justified in expanding the purported consensual pat down search beyond the scope of Defendant's consent.

In this case, the Defendant was unlawfully seized without reasonable suspicion or probable cause that criminal activity was afoot, and the Government

has failed in its burden to show Defendant's consent to the pat down search was an act of free will.  Therefore, all the items seized and all the statements made after the unlawful seizure are fruits of an illegal seizure and will be suppressed.[2]

## IV.    CONCLUSION

Accordingly, for the reasons articulated above, Defendant's Motion to Suppress Evidence [#24] is GRANTED.

SO ORDERED.

Dated:  February 13, 2023                                 /s/Gershwin A. Drain
                                                          GERSHWIN A. DRAIN
                                                          United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 13, 2023, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

---

[2] Defendant also argues his Fourth Amendment rights were violated when the officers placed him in handcuffs without probable cause, as well as when Trooper Sonstrom performed the open-air canine sniff of Defendant's backpack.  Because the Court finds the drugs and statements were seized pursuant to an unlawful seizure, the Court need not resolve whether additional Fourth Amendment violations occurred on February 28, 2022.